PAUL W. KISSLINGER (PK0764)
ANTONIA CHION
YURI B. ZELINSKY
LAWRENCE C. RENBAUM
SCOTT F. WEISMAN
PAMELA H. NOLAN
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
Phone: (202) 551-4427 (Kisslinger)
Fax: (202) 772-9246 (Kisslinger)
kisslingerp@sec.gov

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> SAMUEL ISRAEL III; <br> DANIEL E. MARINO; <br> BAYOU MANAGEMENT, LLC; <br> BAYOU ACCREDITED FUND, LLC; <br> BAYOU AFFILIATES FUND, LLC; <br> BAYOU NO LEVERAGE FUND, LLC; <br> and BAYOU SUPERFUND, LLC, <br><br> Defendants. | CIVIL ACTION NO. <br><br> 05 CIV. 8376 |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

### SUMMARY OF ALLEGATIONS

1. Defendants Samuel Israel III, Daniel E. Marino, and an associate, carried out a scheme to defraud investors in a family of hedge funds controlled by them directly and through defendant Bayou Management, LLC. From 1996 through 2005, Israel and Marino misappropriated, dissipated and lost tens of millions of dollars of their clients' money that was

invested in the Bayou Fund, and its successors, Bayou Accredited Fund, LLC, the Bayou Affiliates Fund, LLC, the Bayou No Leverage Fund, LLC, and the Bayou Superfund, LLC (the "Funds"), and several related offshore funds organized in the Cayman Islands. Investors deposited more than $450 million into the Funds over the course of their existence.

2. The Bayou Fund apparently was conceived as a real hedge fund that traded securities. However, shortly after its inception in 1996, the Fund began to sustain large losses from trading and defendants Israel and Marino, and the associate, a former Bayou principal, began lying to investors regarding the Fund's performance and the value of the investors' accounts. Defendants Israel and Marino also began to misappropriate and dissipate millions of dollars of investor monies from the Fund and, beginning in 2003, the four successor Funds.

3. In the Spring of 2004, defendants stopped nearly all trading in the Funds, although they never disclosed this to their clients. In July 2004, defendants Israel and Marino diverted more than $120 million from the Funds to a bank account in Germany for the purpose of investing in purported high-yield investment programs that, in fact, were nothing more than fraudulent "prime bank instrument" schemes. The money remained tied up in European banks for more than eight months. In April 2005, approximately $100 million was wired from Europe and a U.S.-based account to a bank in New Jersey. On May 19, 2005, the Arizona Attorney General seized that $100 million, and those funds currently remain frozen. During this period, defendants continued to represent to clients that they were actively managing, and profitably trading hundreds of millions of dollars of securities on behalf of, the Funds. Those representations were false.

4. To hide and perpetuate their fraudulent scheme, the defendants knowingly misrepresented the value and performance of the Bayou Fund and the four successor Funds to clients; issued false and misleading financial statements, account statements and performance summary documents; fabricated "independent" audit reports from a fictitious accounting firm; and misled investors regarding other material facts.

5. By engaging in the acts alleged herein, the defendants engaged in, and unless restrained and enjoined by the Court will continue to engage in, transactions, acts, practices, and

courses of business that: with regard to all of the defendants, violate Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; with regard to defendants Israel and Bayou Management, directly violate Section 206(1) and (2) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. § 80b-6(1) and (2)]; and, with regard to defendant Marino, aid and abet violations of Section 206(1) and (2) of the Advisers Act.

6.  The Commission seeks a judgment from the Court: (a) enjoining the defendants from engaging in future violations of the above sections of the federal securities laws; (b) requiring defendants Israel, Marino, and Bayou Management to account for and disgorge, with prejudgment interest, the illegal profits and proceeds they obtained as a result of their actions alleged herein; and, (c) requiring defendants Israel, Marino, and Bayou Management to pay civil money penalties pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act [15 U.S.C. §§ 77t(d), 78u(d)(3), and 80b-9(e)].

## JURISDICTION

7.  The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, Sections 21(d), 21(e) and 27 of the Exchange Act, and Section 214 of the Advisers Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a), 78u(d), 78u(e), 78aa, and 80b-14].

8.  The defendants made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices, and courses of business alleged herein, certain of which occurred within the Southern District of New York. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and Section 214 of the Advisers Act [15 U.S.C. §§ 77v(a), 78aa, and 80b-14].

## THE PARTIES

9.  The plaintiff is the Securities and Exchange Commission, which brings this civil action pursuant to authority conferred on it by Section 20(b) of the Securities Act, Section 21(d)(1)

of the Exchange Act, and Section 209 of the Advisers Act [15 U.S.C. §§ 77t(b), 78u(d)(1), and 80b-9].

10. Defendant **Samuel Israel III**, age 46, is a resident of New York. He is the Managing Member of Bayou Management and, at all relevant times, acted as a principal, agent, and control person of, and investment adviser to, the Funds.

11. Defendant **Daniel E. Marino**, age 45, is a resident of Connecticut. He is the chief financial officer of Bayou Management and, at all relevant times, acted as a principal, agent, and control person of the Funds.

12. Defendant **Bayou Management, LLC** is a New York limited liability company with its principal place of business at 40 Signal Road, Stamford, Connecticut 06902. Defendants Israel and Marino, acting through Bayou Management, directed, managed, and controlled the business of the Funds, and Bayou Management acted as an investment adviser to the Funds.

13. Defendants **Bayou Accredited Fund, LLC**, **Bayou Affiliates Fund, LLC**, **Bayou No Leverage Fund, LLC**, and **Bayou Superfund, LLC** are all Delaware limited liability companies with their principal place of business at 40 Signal Road, Stamford, Connecticut 06902. The Funds purported to be hedge funds.

## RELATED ENTITIES

14. **Bayou Securities, LLC**, is a Delaware limited liability company with its principal place of business at 40 Signal Road, Stamford, Connecticut 06902. Bayou Securities is owned by defendant Israel and acted as the introducing broker for trades executed on behalf of the Bayou Funds.

15. **Bayou Master Offshore Fund, Ltd.**, **Bayou Offshore Fund A, Ltd.**, **Bayou Offshore Fund B, Ltd.**, **Bayou Offshore Fund C, Ltd.**, **Bayou Offshore Fund D, Ltd.**, **Bayou Offshore Fund E, Ltd.**, and **Bayou Offshore Fund F, Ltd.** (collectively, the "Offshore Funds"), are all exempted limited companies organized and incorporated in the Cayman Islands. Bayou Management directed the creation of these entities in the Cayman Islands to accept foreign

investments in the Bayou Funds. Bayou Management routinely transferred money deposited in the Offshore Funds into the United States, where it invested the money in one of the Bayou Funds.

## FACTS

16.     In 1996, Israel, Marino, and a former Bayou principal, opened their first private pooled investment fund, known as a "hedge fund," the Bayou Fund, and began soliciting potential clients. In a reorganization in January 2003, Israel and Marino, acting through Bayou Management, liquidated the Bayou Fund and created four separate funds: defendants Bayou Accredited Fund, LLC; Bayou Affiliates Fund, LLC; Bayou No Leverage Fund, LLC; and Bayou Superfund, LLC.

17.     From 1996 through July 31, 2005, Bayou Management clients deposited more than $450 million into the Funds. Although certain Bayou investors were able to recover their investments before the fraud unraveled, the defendants lost and stole tens of millions of dollars of their clients' money from 1996 through the present, although they continually represented to clients and potential investors that the Bayou Fund and its successor Funds were making money.

18.     The Funds' assets were traded through accounts maintained by Bayou Securities, a broker-dealer owned by defendant Israel. Bayou Securities cleared its trades in the Funds through an arrangement with another registered broker-dealer that acted as the Funds' prime broker. Hedge funds typically establish prime brokerage relationships to consolidate trading activity for operational and accounting convenience. Bayou Management also maintained, on behalf of the Funds, primary bank accounts at Citibank and then at Wachovia Bank.

**I.      THE FRAUD BEGINS**

19.     In 1996, within a few months after the Bayou Fund opened and started trading, the defendants and a former Bayou principal sustained trading losses and began lying to their customers about the Fund's profits and losses. In fund performance summaries that the defendants periodically sent to their clients, they concealed the volatile swings of their trading gains and losses by "padding" and fabricating the results.

20. In 1997, the profits of the Bayou Fund fell short of the amount defendants had projected. To cover the difference between actual and projected profits, and to keep clients and attract new ones, the defendants, acting on Marino's suggestion, transferred back into the Fund a portion of the trading commissions that the Fund had paid to Bayou Securities during that year. The defendants did not disclose to their clients that the Fund's performance was being bolstered at year-end by these rebates, and that the annual results did not accurately reflect the loss that the Fund had sustained from trading during 1997. Bayou clients were thus left with a false impression that the Bayou Fund had made a profit.

21. In 1998, the Bayou Fund sustained a net loss of millions of dollars from trading. Over the course of the year, Israel and Marino concealed their losses by making material misstatements to clients about the Bayou Fund's performance and their clients' capital balances. Israel, Marino, and a former Bayou principal concocted false investment returns to report to their clients, and applied those false results to create false year-end financial statements. In December 1998, the Bayou Fund's mounting losses could not withstand an independent audit. In meetings at or around that time, defendants and a former Bayou principal decided to dismiss the Fund's independent auditing firm, and fabricate auditor's reports, financial statements, and performance summaries. Marino, a certified public accountant, agreed to fabricate the annual audit of the Bayou Fund in order to conceal the trading losses.

22. Toward that end, Marino created a fictitious accounting firm -- "Richmond-Fairfield Associates" -- to pose as the independent auditor of the Bayou Fund. In fact, Marino was the sole principal of Richmond-Fairfield, and the "firm" had no other clients.

23. Marino prepared a phony "independent" audit report for the Bayou Fund in 1998. His "audit," which, of course, was not at all independent, consisted of fabricating financial data to create the appearance in the Fund's financial statements that the Fund had realized a profit in 1998.

24. The positive results that Israel, Marino, and a former Bayou principal, reported for the Bayou Fund for 1998 were false and misleading because, in fact, the Fund had lost a substantial amount of money that year. Marino did not -- indeed, could not -- prepare workpapers that

accurately verified the Bayou Fund's profits and losses, and assets under management, because to do so would have revealed the fraud that Israel and Marino had been and were perpetrating on the Fund's clients.

## II. THE FRAUD CONTINUES

25. In 1999, the Bayou Fund again lost a material amount of money. Defendants Israel and Marino, and a former Bayou principal, again concealed the loss by creating and distributing to the Fund's investors false performance summaries and a false financial statement that purportedly had been audited by Richmond-Fairfield Associates. In the summaries and year-end financial statements, Israel and Marino again fabricated the Fund's results in order to make it appear that the Fund was earning trading profits and achieving earnings targets that the defendants had formulated to create the appearance of modest, steady, and believable growth.

26. During 2000, the Bayou Fund continued to lose substantial amounts of money through the defendants' unsuccessful trading, and the Fund sustained a net loss for the year. However, as in prior years, Israel, Marino, and a former Bayou principal, concealed the loss with false financial statements and a fictitious audit. In 2001 and 2002, the Fund continued to sustain trading losses and Israel and Marino again falsified the Bayou Fund's results in periodic performance summaries and year-end financial statements that were sent to the Fund's investors that reported a one to two percent net profit per month that comported with the defendants' fabricated earnings' targets.

27. Throughout the period from 1996 through 2002, even as Israel, Marino, and a former Bayou principal, were lying to investors regarding the Bayou Fund's performance and disguising its persistent and substantial losses, they actively solicited both new and current investors and raised tens of millions of dollars of additional capital.

28. In January 2003, defendants liquidated the Bayou Fund and created the four successor funds -- Accredited, Affiliates, No Leverage, and Superfund -- in order to attract more investors and capital. While investor deposits peaked in 2003 at more than $125 million, the reorganization did not improve profitability. The Funds lost even more money through trading. In

2003, Bayou Superfund took in more than $90 million in investments, but lost approximately $35 million through trading. Defendants falsely represented, however, in the Funds' 2003 annual statement that Bayou Superfund had earned more than $25 million.

### Israel and Marino Enriched Themselves at Investors' Expense

29. Israel and Marino used Bayou Securities, LLC, which is wholly-owned by Israel, to execute the vast majority of the Funds' trades. Bayou Securities earned commissions on these trades. Israel's trading strategy required the funds to buy and sell tens of millions of dollars of securities on a nearly daily basis, akin to a day-trading strategy. Israel made dozens of very large trades every month, often with several trades per month that involved tens of millions of dollars of securities. Such trading yielded enormous commissions for Bayou Securities, from which Israel and Marino paid themselves annual salaries and additional profit distributions.

30. As a result of the commission arrangement, even Israel's occasionally profitable trades nevertheless resulted in net losses to the Funds because of the high commissions, while some money-losing trades were profitable for Israel and Marino because of the commissions that the Funds paid to Bayou Securities. In 2003 alone, while the Bayou Funds lost approximately $49 million of investor money from bad trades, Bayou Securities earned approximately $29 million in commissions.

31. Despite the fact that the Funds never achieved an actual year-end profit, Israel and Marino, through Bayou Management, at least in some years withdrew "incentive fees" that were a percentage of the Funds' fictionalized profits. Under the terms of the Operating Agreements, incentive fees were only payable if a Fund had returned a profit in a particular year. Israel and Marino not only lied to investors when they portrayed the Funds as profitable, but they also further defrauded investors by paying themselves incentive fees as if the fictitious profits actually existed.

32. Starting in 2003, Israel and Marino diverted money from the Funds, and from their incentive fees, to invest in private placements of non-public startup companies, under their own names or through newly formed partnerships. They invested millions of dollars in these private

venture capital investments. Defendants never disclosed to their clients that they were misappropriating monies from the Funds for these purposes.

### III. DEFENDANTS STOP TRADING, LIQUIDATE THE FUNDS, AND INVEST IN FRAUDULENT PRIME BANK INSTRUMENT SCHEMES

33. In 2004, the defendants, and particularly Israel, apparently became desperate to recoup the enormous losses that had been sustained by the Funds. Israel began searching for high-payout, short term investments and made the assets of the Funds vulnerable to theft and fraudulent investment scams.

34. In April 2004, defendants Israel and Marino wound down and largely suspended trading on behalf of the Funds, drained virtually all of the Funds' prime brokerage accounts, and wired the remaining funds, approximately $150 million, into Bayou Management's account at Citibank. Thereafter, nominally with the consent of Bayou's "Board" (in fact, it consisted only of Israel and Marino), Israel sought to invest in a series of "prime bank instrument trading programs" in Europe. These programs, which themselves are an enduring staple among fraudulent investment scams, required that large sums of money be sent to various foreign and domestic bank accounts.

35. Despite the patently dubious nature of the trading programs to which he was being steered, Israel pursued them using monies taken from the Funds. Marino supported and abetted Israel by wiring the Funds' monies to various banks and brokerages in Europe and North America. These movements of cash obscured the source of the funds, which were commingled and deposited in Israel's name. Neither Israel nor Marino ever disclosed to the Funds' investors that their monies had been diverted for this purpose.

36. In July 2004, defendants transferred $120 million to a bank account in Israel's name at Deutsche Postbank in Hamburg, Germany, for investment in a bogus trading program. In October 2004, Israel transferred the funds to another German bank, and then on to a British brokerage firm to an account in his own name. In April 2005, Israel wired approximately $99 million from the British brokerage firm to an account at Wachovia Bank in Flemington, N.J., in the name of a registered broker-dealer that is operated by an individual who held himself out as

a principal of a prime bank program in which Israel had sought to invest. Marino wired additional funds to that account to establish an approximately $100 million balance.

37.   In May 2005, the Arizona Attorney General's Office, after having been alerted by bank officials concerned about attempts to effect sizeable money transfers by the Flemington-based principal, conducted an investigation regarding the origin of the funds in the Flemington Wachovia account. The Arizona Attorney General's Office concluded that the funds likely were the proceeds of a fraudulent prime bank instrument scheme, and commenced a forfeiture action against the funds. The funds currently remain frozen by Arizona state court order. On September 1, 2005, the U.S. Attorney's Office for the Southern District of New York commenced a civil forfeiture action (No. 05-CV-7722 CM) to recover these funds for the benefit of Bayou Funds' investors.

## IV. DEFENDANTS ISSUED FRAUDULENT REPORTS AND STATEMENTS TO HIDE AND PERPETUATE THEIR FRAUD

38.   During the period of the fraud, from 1996 through 2005, the defendants communicated with their clients and prospective investors through weekly electronic newsletters, periodic account statements and reports, and annual financial statements. Almost all of information contained in these documents was false and materially misleading. In particular, performance summaries, and statements of the Funds' total capital that were disseminated to current and prospective investors were either entirely false or materially misleading throughout the period of the fraud.

39.   From 2001 through 2005, Bayou Management distributed to its clients its annual Financial Statements And Report Of Independent Certified Public Accountants ("Financial Statements") for the previous fiscal year. The Operating Agreements for the Funds required that each Fund's profits and losses be determined in accordance with Generally Accepted Accounting Principles, and that Bayou Management enter all of the Funds' transactions fully and accurately in records and books of account. Each of these financial statements, however, contained fabricated financial information about the assets and earnings of the Funds, and a falsified auditors' report.

40.     For example, the 2003 Financial Statements, that were sent to investors in March 2004, contained, among others, the following misstatements: (a) the statement of financial condition represented that the Funds had total assets of $323,002,549; (b) the statement of changes in members' capital represented that the clients' capital was $285,915,188; (c) the statement of operations represented that the Funds earned net income of $34,527,736; and (d) the statement of cash flow represented that the Funds' net realized and unrealized gain from investment transactions was $43,457,449. All of this information was false or materially misleading because the Funds had actually lost $49 million from investment transactions, including approximately $35 million in the Bayou Superfund alone. Put simply, the defendants failed to disclose that they had been and were continuing to perpetrate a fraud on the Funds' investors.

41.     Similarly, the 2004 Financial Statements, that were distributed to the investors in April 2005, contained, among others, the following misstatements: (a) the statement of financial condition represented that the Funds owned total assets of $410,626,200; (b) the statement of changes in members' capital represented that the clients' capital was $373,040,348; (c) the statement of operations represented that the Funds earned net income of $43,446,315; and (d) the statement of cash flow represented that the Funds' net realized and unrealized gain from investment transactions was $54,380,982. As in 2003, all of this information was false or materially misleading because in 2004 the Funds had continued to incur million-dollar losses. Moreover, the defendants also failed to disclose that, in April 2004, the Funds had ceased nearly all trading activities, had been drained by Bayou Management's principals, and had been transferred into Israel's name in European bank accounts for use in prime bank note trading programs. By the time of the release of the 2004 audited financials in March 2005, the hedge funds (that were still attracting investors) had ceased to exist altogether.

42.     Every Financial Statement during the period from 2001 through 2005 was accompanied by a Report of Independent Certified Public Accountants, on Richmond-Fairfield letterhead, and purportedly certified by Richmond-Fairfield Associates. The audit opinion letters accompanying the reports represented that the financial statements presented the financial

11

condition of the Funds "fairly, in all material respects, . . . in conformity with generally accepted accounting principles." The Financial Statements also included an oath of affirmation, signed by Israel, stating that "the information reflected herein is accurate and complete to the best of my knowledge." The audit reports, and Israel's affirmations, were false and misleading. As discussed above, Richmond-Fairfield Associates was a sham entity created by Marino, with the concurrence of Israel and a former Bayou principal, to hide and perpetuate the fraud. From 2001 through the present, there was never an audit of the Funds -- independent or otherwise -- and the results reported in the financial statements were fabricated to disguise massive Fund losses and to enable Israel and Marino to retain and attract investors.

43. Each month from at least 2001 through May 2005, defendants mailed to their clients account statements showing each client's opening capital, closing capital, and profit and loss for the month. Because the Funds incurred losses throughout this period, and in light of the ongoing fraud perpetrated by the defendants, these account statements were materially false and misleading.

44. Defendants also periodically sent investors by e-mail a newsletter that presented Funds' performance information under the headings "Rate of Return," "Attribution Summary and Commentary," and "Monthly Statistical Breakdown." The newsletter purported to show, among other things, the Funds' rate of investment returns as compared to the Standard & Poor's 500 index, the Funds' average exposure given its intraday long and short positions, and the Funds' business sector exposure given its long and short positions in particular sectors. These data were intended to, and did, convey to the Funds' investors the false impression that Bayou Management was actively and profitably engaged in securities trading on behalf of the Funds.

45. The Attribution Summary and Commentary also was intended to, and did, create the false impression that active and profitable securities trading was being carried out on behalf of the Funds. These commentaries included false and misleading statements regarding Bayou Management's execution of profitable trading strategies even after defendants Israel and Marino had largely suspended trading on behalf of the Funds and had drained virtually all of the capital

from Bayou's prime brokerage accounts. Israel and Marino also did not reveal that, by the end of April 2004, the defendants had largely suspended trading in the Funds; had withdrawn virtually all of the cash from the Funds' prime brokerage accounts; and had transferred most of the Funds' remaining assets to European bank accounts held in Israel's name.

## V.     THE BAYOU FRAUD UNRAVELS

46.     On July 27, 2005, defendants Israel and Marino sent a letter from Israel to the Funds' investors stating that Funds would be liquidated and ninety percent of the clients' capital balances would be distributed by August 12, 2005, with the remaining ten percent to follow at the end of the month. This was the type of redemption called for under the Operating Agreements.

47.     On August 11, 2005, Israel sent another letter to clients stating that they would receive ninety percent of their investments the following week and the remaining ten percent by the end of the month. Redemption checks tendered to clients in August 2005, however, were returned for insufficient funds. Documents obtained from Bayou-related bank accounts show that the accounts were overdrawn before the liquidation and redemption checks were drafted.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (All Defendants)

48.     The Commission realleges and reincorporates paragraphs 1 through 47 as if fully set forth herein.

49.     From at least 1998 to July 31, 2005, the defendants, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or

would operate as a fraud or deceit upon the purchasers of the securities offered and sold by the defendants.

50.　By reason of their actions alleged herein, the defendants each violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (All Defendants)

51.　The Commission realleges and reincorporates paragraphs 1 through 50 as if fully set forth herein.

52.　From at least 1998 to July 31, 2005, the defendants, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

53.　By reason of their actions alleged herein, the defendants each violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Direct Violations (Bayou Management and Israel)
### and Aiding and Abetting Violations (Marino)
### of Section 206(1) and (2) of the Advisers Act

54.　The Commission realleges and reincorporates paragraphs 1 through 53 as if fully set forth herein.

55.　From at least 1998 through July 31, 2005, Bayou Management and Israel, by use of the means or instrumentalities of interstate commerce or of the mails, and while engaged in the

business of advising others for compensation as to the advisability of investing in, purchasing or selling securities: (a) employed devices, schemes and artifices to defraud; and (b) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

56.     By reason of their actions alleged herein, Bayou Management and Israel each violated Section 206(1) and (2) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6(1) and (2)].

57.     By knowingly or recklessly concealing the Funds' losses and mailing monthly account statements that misrepresented the value of client accounts, among other things, Marino, by use of the means or instrumentalities of interstate commerce, or of the mails, aided and abetted Bayou Management and Israel in their violations of Section 206(1) and (2) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6(1) and (2)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that the defendants each violated the securities laws and Rule promulgated thereunder as alleged herein;

### II.

Permanently enjoin each of the defendants from violating Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 promulgated thereunder, and Section 206(1) and (2) of the Investment Advisers Act of 1940 [15 U.S.C. §§ 77q(a), 78j(b), 80b-6(1) and (2); 17 C.F.R. § 24010b-5];

### III.

Order defendants Israel, Marino, and Bayou Management jointly and severally to disgorge the profits and proceeds they obtained as a result of their actions alleged herein and to pay prejudgment interest thereon;

### IV.

Order defendants Israel, Marino, and Bayou Management each to pay a civil money penalty pursuant to Section 20(d) of the Securities Act of 1933, Section 21(d)(3) of the Securities Exchange Act of 1934, and Section 209(e) of the Investment Advisers Act of 1940 [15 U.S.C. §§ 77t(d), 78u(d)(3), 80b-9(e)];

### V.

Grant such other relief as this Court may deem just and proper.

Dated: September 29, 2005     Respectfully submitted,

*[signature: Paul W. Kisslinger]*

Of Counsel:
Antonia Chion
Yuri B. Zelinsky
Lawrence C. Renbaum
Scott F. Weisman
Pamela H. Nolan

Paul W. Kisslinger (PK0764)
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4427
(202) 772-9246 (fax)
e-mail: *kisslingerp@sec.gov*